# VUE Charlotte Contract Documents







EXHIBIT

# THE VUE CHARLOTTE, A CONDOMINIUM
## PURCHASE AGREEMENT

**HUD Property Report:**
**ILS No. 31740; effective date October 17, 2008 ("Property Report")**

ORAL REPRESENTATIONS CANNOT BE RELIED UPON AS CORRECTLY STATING THE REPRESENTATIONS OF THE SELLER. FOR CORRECT REPRESENTATIONS, REFERENCE SHOULD BE MADE TO THIS CONTRACT AND THE PUBLIC OFFERING STATEMENT REQUIRED BY SECTION 47C-4-102 OF THE NORTH CAROLINA GENERAL STATUTES.

If the first letter of a word is capitalized in this Agreement, that word will have the meaning given to it in this Agreement or in the Declaration (as defined in section 1 of this Agreement).

NOTWITHSTANDING ANY CONTRARY TERMS IN THIS AGREEMENT, IN THE EVENT THAT PURCHASER'S DEPOSIT CHECK IS RETURNED FOR INSUFFICIENT FUNDS OR OTHERWISE FAILS TO CLEAR, THIS CONTRACT SHALL AUTOMATICALLY TERMINATE, WITHOUT NEED FOR NOTICE TO PURCHASER. THEREAFTER, THIS AGREEMENT SHALL BE OF NO FURTHER FORCE AND EFFECT, AND PURCHASER SHALL BE ENTITLED TO SELL THE CONTRACT UNIT TO ANOTHER PURCHASER.

*YOU HAVE THE OPTION TO CANCEL YOUR CONTRACT OR AGREEMENT OF SALE BY NOTICE TO THE SELLER UNTIL MIDNIGHT OF THE SEVENTH DAY FOLLOWING THE SIGNING OF THE CONTRACT OR AGREEMENT.*

*IF YOU DID NOT RECEIVE A PROPERTY REPORT PREPARED PURSUANT TO THE RULES AND REGULATIONS OF THE OFFICE OF INTERSTATE LAND SALES REGISTRATION, U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, IN ADVANCE OF YOUR SIGNING THE CONTRACT OR AGREEMENT, THE CONTRACT OR AGREEMENT OF SALE MAY BE CANCELLED AT YOUR OPTION FOR TWO YEARS FROM THE DATE OF SIGNING.*

1.  <u>Purchase and Sale</u>.  In this Agreement, the term "Purchaser" or "Buyer" means or refers to **Lawrence V. and Ke Ding Berkovich**.  The word "Seller" means or refers to The VUE North Carolina, LLC, a Delaware limited liability company.

Purchaser agrees to buy, and Seller agrees to sell (on the terms and conditions contained in this Agreement), Unit **5102** (the "Unit") in the proposed **THE VUE CHARLOTTE, A CONDOMINIUM** (the "Condominium").  The legal description of the Unit will be:

> BEING all of that Unit **5102** of the VUE Charlotte, a Condominium, as described in the Declaration of Condominium of the VUE Charlotte, a Condominium (the "Declaration"), recorded in Book ___ Page ___ in the Office of the Register of Deeds for Mecklenburg County, North Carolina, as shown on the plat and plans for the Condominium recorded in Unit File No. ___ in the Office of the Register of Deeds for Mecklenburg County, North Carolina; TOGETHER with the percentage interest in the Common Elements appurtenant to said Unit, as set forth in the Declaration.

The Unit and the Condominium are described in greater detail in the Public Offering Statement, the draft Declaration, and in the exhibits attached to both (all together the "Condominium Documents") the contents of which are hereby incorporated into this Agreement as if repeated herein at length.  Buyer acknowledges receipt of the Condominium Documents on or before the date of this Agreement.

2.  <u>Payment of the Purchase Price</u>.  The total purchase price ("Purchase Price") for the Unit is **$1,283,000.00**.  Purchaser agrees to make payments towards the Purchase Price as follows:

| <u>Payment</u> | <u>Due Date</u> | <u>Amount</u> |
|---|---|---|
| Deposit (10% of Purchase Price) | Upon execution of Agreement | $145,485.00 |
| Balance | At Closing | $1,137,515.00 |
| Total Purchase Price | | $1,283,000.00 |

The Deposit and the balance due at closing must be paid by bank cashier's check or by wire transfer of federal funds.  All payments must be made in United States funds and all checks must be payable on a bank located in the continental United States.  If Purchaser fails to pay any deposit on time, and Seller agrees to accept it on a later date (which Seller is not obligated to do), Purchaser will pay a late funding charge equal to interest on such deposit at the rate of 16% per annum from the date due until the date received and cleared by Seller.

Purchaser also agrees to pay all closing costs and other sums required to be paid by Purchaser under this Agreement.  These charges are subject to change as provided in section 11

2

4844-9934-1059.01

1.  <u>Purchase and Sale</u>.  In this Agreement, the term "Purchaser" or "Buyer" means or refers to **Lawrence V. and Ke Ding Berkovich**.  The word "Seller" means or refers to The VUE North Carolina, LLC, a Delaware limited liability company.

Purchaser agrees to buy, and Seller agrees to sell (on the terms and conditions contained in this Agreement), Unit **5102** (the "Unit") in the proposed **THE VUE CHARLOTTE, A CONDOMINIUM** (the "Condominium").  The legal description of the Unit will be:

> BEING all of that Unit **5102** of the VUE Charlotte, a Condominium, as described in the Declaration of Condominium of the VUE Charlotte, a Condominium (the "Declaration"), recorded in Book ___ Page ___ in the Office of the Register of Deeds for Mecklenburg County, North Carolina, as shown on the plat and plans for the Condominium recorded in Unit File No. ___ in the Office of the Register of Deeds for Mecklenburg County, North Carolina; TOGETHER with the percentage interest in the Common Elements appurtenant to said Unit, as set forth in the Declaration.

The Unit and the Condominium are described in greater detail in the Public Offering Statement, the draft Declaration, and in the exhibits attached to both (all together the "Condominium Documents") the contents of which are hereby incorporated into this Agreement as if repeated herein at length.  Buyer acknowledges receipt of the Condominium Documents on or before the date of this Agreement.

2.  <u>Payment of the Purchase Price</u>.  The total purchase price ("Purchase Price") for the Unit is **$1,283,000.00**.  Purchaser agrees to make payments towards the Purchase Price as follows:

| <u>Payment</u> | <u>Due Date</u> | <u>Amount</u> |
|---|---|---|
| Deposit (10% of Purchase Price) | Upon execution of Agreement | $145,485.00 |
| Balance | At Closing | $1,137,515.00 |
| Total Purchase Price | | $1,283,000.00 |

The Deposit and the balance due at closing must be paid by bank cashier's check or by wire transfer of federal funds.  All payments must be made in United States funds and all checks must be payable on a bank located in the continental United States.  If Purchaser fails to pay any deposit on time, and Seller agrees to accept it on a later date (which Seller is not obligated to do), Purchaser will pay a late funding charge equal to interest on such deposit at the rate of 16% per annum from the date due until the date received and cleared by Seller.

Purchaser also agrees to pay all closing costs and other sums required to be paid by Purchaser under this Agreement.  These charges are subject to change as provided in section 11

2

4844-9934-1059.01

of this Agreement and are explained in more detail in that section, as are other closing costs which cannot be computed at this time.

3.  How Purchaser Pays. Purchaser understands and agrees that Purchaser will be obligated to pay "all cash" at closing. This Agreement and Purchaser's obligations under this Agreement to purchase the Unit will not depend on whether Purchaser qualifies for or obtains a mortgage from any lender. Purchaser will be solely responsible for making Purchaser's own financial arrangements. Seller agrees, however, to cooperate with any lender Purchaser chooses and to coordinate closing with such lender, if, but only if, such lender meets the Seller's closing schedule and properly funds its loan at closing. Notwithstanding any cooperation provided by Seller, nothing herein shall be deemed to qualify or otherwise condition Purchaser's obligation to close "all cash" on the purchase of the Unit.

Although Seller does not have to do so, if Seller agrees to delay closing until Purchaser's lender is ready, Purchaser agrees to pay Seller a late funding charge equal to interest at the rate of 16% per annum on all funds due Seller which have not then been paid to Seller from the date Seller originally scheduled closing to the date of actual closing and funding. This late funding charge may be estimated and charged by Seller at closing. Seller's estimate will be adjusted after closing based on the actual closing and funding date upon either Seller's or Purchaser's written request. Purchaser will not be allowed to take possession of the Unit until Seller actually receives the funds and they have cleared. This section 3 will survive (continue to be effective) after closing.

4.  Deposits. From the time that the Purchaser makes the Deposit hereunder until the expiration of the period of time within which Purchaser is entitled to cancel this Agreement pursuant to Section 47C-4-108 of the North Carolina General Statutes, that is, for a period of seven calendar days following the execution of this Agreement, Purchaser's Deposit will be held in escrow by Chicago Title Insurance Company, as escrow agent, 200 South Tryon Street, Suite 800, Charlotte, NC 28202, in accordance with the escrow agreement contained in the Condominium Documents. The escrow agreement is incorporated into this Agreement as if repeated at length here, and Purchaser agrees that the Deposit may be held in any insured bank located in the State of North Carolina.

If Purchaser so requests, Purchaser may obtain a receipt for Purchaser's Deposit from the escrow agent. Seller may change escrow agents (as long as the new escrow agent is authorized to be an escrow agent under applicable North Carolina law), in which case Purchaser's Deposit may be transferred to the new escrow agent at Seller's direction.

Upon the expiration of the above described statutory (7) day cancellation period, Seller shall have the unilateral right to direct and require Escrow Agent to hold the Deposit for Seller's benefit or to deliver the Initial Deposit to Seller. In the event that Seller directs Escrow Agent to release the Deposit to Seller, Seller may use the Deposit, or any portion thereof, any and all other deposits, if any, delivered by Buyer to Seller or to Escrow Agent, for any purpose in connection with the Condominium, including but not limited to the marketing, development and construction thereof. The Deposit shall become non-refundable and payable to Seller upon the expiration of the seven (7) day statutory cancellation period.

5.  Seller's Financing. Seller may borrow money from lenders for the development and construction of the Condominium. Purchaser agrees that any lender advancing funds for Seller's use in connection with the Condominium will have a prior deed of trust on the Unit and

3

4844-9934-1059.01

the Condominium until closing. At that time, Seller shall cause the then applicable deed(s) of trust to be released as an encumbrance against the Unit and Seller may use Purchaser's closing proceeds for such purpose. Neither this Agreement, nor Purchaser's payment of deposits, will give Purchaser any lien or claim against the Unit or the Condominium. Without limiting the generality of the foregoing, Purchaser's rights under this Agreement will be subordinate to all deeds of trust (and all modifications made to those deeds of trust) affecting the Unit or the Condominium even if those deeds of trust (or modifications) are made or recorded after the date of this Agreement.

6.     <u>Insulation; Energy Efficiency</u>. Seller has advised Purchaser, as required by the rules of the Federal Trade Commission, that it intends, currently, to install in connection with the Unit, the following insulation: (a) insulation with an R-value of R-15 in the roofs; and (b) insulation with an R-value of R-4 over the non-conditioned areas of the floor slabs. This R-value information is based solely on the information given by the appropriate manufacturers and Purchaser agrees that Seller is not responsible for the manufacturer's errors. To the extent required by applicable law, each purchaser may, at Purchaser's cost, have the Condominium building's energy efficiency rating determined.

All insulation and energy efficiency rating information is subject to Seller's rights, under this Agreement, to make changes in Seller's Plans and Specifications, and to limit Seller's liability to Purchaser.

7.     <u>Completion Date</u>. Seller estimates that the construction of the Unit in the manner specified in this Agreement will be substantially complete by December 31, 2011, subject, however, only to delays caused by matters which are legally recognized as defenses to contract actions in the jurisdiction where the building is being erected, including without limitation "Force Majeure" (as defined in section 35 of this Agreement).

8.     <u>Inspection Prior to Closing</u>. Purchaser will be given an opportunity prior to closing, on the date and at the time scheduled by Seller, to inspect the Unit with Seller's representative. At that time, Purchaser will sign an inspection statement listing any defects in workmanship or materials (only within the boundaries of the Unit itself) which Purchaser discovers. If any item listed is actually defective in workmanship or materials in Seller's opinion (keeping in mind the construction standards applicable in Mecklenburg County, North Carolina, for similar property), Seller will correct those defects at its cost within sixty (60) days after closing, but Seller's obligation to correct will not be grounds for deferring the closing, nor for imposing any condition on closing. No escrows or holdbacks of closing funds will be permitted. If Purchaser fails to take advantage of the right to pre-closing inspection on the date and time scheduled, Seller will not be obligated to reschedule an inspection prior to closing.

Purchaser acknowledges that all matters pertaining to the initial construction of the Unit will be handled by Seller and Seller's representatives. Purchaser shall not interfere with or interrupt any workmen at the site of the Unit. No personal inspections (other than the one pre-closing inspection) will be permitted.

9.     <u>Closing Date</u>. Purchaser understands that Seller has the right to schedule the date, time and place for closing.

Before Seller can require Purchaser to close, however, two things must be done:

4

4844-9934-1059.01

(a)    Seller must record the Declaration, Plat and Plans, and certain related Condominium Documents in the Office of the Register of Deeds for Mecklenburg County, North Carolina; and

(b)    Seller must obtain a temporary (or permanent) certificate of occupancy for or covering the Unit from the proper governmental agency (a certificate of occupancy, whether temporary or permanent, is the official approval needed before a unit may be lived in), but the Common Elements and other portions of the Condominium Property need not then have certificates of occupancy, nor be completed.

Purchaser will be given at least thirty (30) days' notice of the date, time and place of closing. Closing will be conducted at or through the offices of Seller's closing attorney, who will be identified in such notice. Closing will occur in Charlotte, North Carolina. Seller is authorized to postpone the closing for any reason and Purchaser will close on the new date, time and place specified in a notice of postponement (as long as at least 3 days notice of the new date, time and place is given). A change of time or place of closing only (one not involving a change of date) will not require any additional notice period. Any formal notice of closing, postponement or rescheduling may be given orally, by telephone, telegraph, telex, telecopy, mail or other reasonable means of communication at Seller's option. All of these notices will be sent or directed to the address, or given by use of the information specified on page 2 of this Agreement unless Seller has received written notice from Purchaser of any change prior to the date the notice is given. These notices will be effective on the date given or mailed (as applicable). An affidavit of one of Seller's employees or agents stating that this notice was given or mailed will be conclusive.

If Purchaser fails to receive any of these notices because Purchaser failed to advise Seller of any change of address or phone, telecopy or telex number, because Purchaser has failed to pick up a letter when he has been advised of an attempted delivery or because of any other reason, Purchaser will not be relieved of his obligation to close on the scheduled date unless Seller agrees in writing to postpone the scheduled date.

If Seller agrees in writing to reschedule closing at Purchaser's request, or if Purchaser is a corporation or other entity and Purchaser fails to produce the necessary corporate or entity papers Seller requests and as a result, closing is delayed, or if closing is delayed for any other reason (except for a delay desired, requested or caused by Seller), Purchaser agrees to pay at closing a late funding charge equal to interest, at the rate or 16% per annum, on that portion of the purchase price not then paid to Seller (and cleared), from the date Seller originally scheduled closing to the date of actual closing. All prorations will be made as of the originally scheduled date. Purchaser understands that Seller is not required to reschedule or to permit a delay in closing.

10.    Closing. The term "closing" refers to the time when Purchaser pays the Purchase Price to Seller and Seller delivers the deed to the Unit to Buyer and ownership changes hands. At closing, Seller promises to give Purchaser a special warranty deed to the Unit. The special warranty deed will be subject to (that is, contain exceptions for) the liens, encumbrances, defects, and other exceptions listed in the Public Offering Statement and such other exceptions as may appear of record at the time of closing, provided that such other exceptions do not materially and adversely interfere with Purchaser's occupancy, use, and enjoyment of the Unit for residential purposes.

5

4844-9934-1059.01

Purchaser will also receive at closing Seller's form of owner's ("no lien") affidavit and FIRPTA (non-foreign) affidavit. When Purchaser receives the special warranty deed at closing, Purchaser will sign a closing agreement and all papers that Seller deems necessary or appropriate.

At the same time Purchaser receives the special warranty deed, Purchaser agrees to pay the balance of the Purchase Price and any additional amounts owed under this Agreement.

11.    Closing Costs. Purchaser understands that, in addition to the Purchase Price for the Unit, Purchaser shall pay, when title is delivered to Purchaser at closing, all of those other fees or "closing costs" typically associated with the closing of a residential real estate transaction in Mecklenburg County, North Carolina. These include without limitation:

(a)    The costs of officially recording the deed and of the premium for any owner's title insurance policy issued for Purchaser, and the reasonable attorney's fees of the attorney conducting the closing.

(b)    Loan fees, closing costs, lender's attorney's fees, closing agent charges, escrows, appraisals, credit fees, lender's title insurance premiums, prepaid amounts, and all other expenses charged by any lender extending Purchaser a loan, if applicable.

(c)    A working capital contribution in an amount equal to twice the monthly installment of the annual assessment owed to the Condominium Association which contribution is payable directly to the Association to provide it with initial capital and which is not a prepayment of assessments and will not be credited against regular assessments.

(d)    A reimbursement to Seller for any utility, cable or interactive communication deposits or hook-up fees which Seller may have advanced prior to closing for the Unit.

(e)    Any charge for any options or upgrading of standard items included, or to be included, in the Unit as agreed to in writing by both Purchaser and Seller.

(f)    Reimbursement to Seller, and/or Seller's closing agents, for charges incurred in connection with coordinating closing with Purchaser and/or Purchaser's lender, including, without limitation, charges for messenger expenses, long distance telephone calls, photocopying expenses, telecopying charges and others.

(g)    The late funding charges provided for elsewhere in this Agreement.

Current expenses of the Unit (for example, taxes and governmental assessments and current monthly assessments payable to the Association) will be prorated between Purchaser and Seller as of the date of closing. Additionally, at closing, Purchaser shall be obligated to prepay the next month's assessment to the Association. If taxes for the year of closing are assessed on the Condominium as a whole, Purchaser shall pay Seller, at closing, the Unit's allocable share of those taxes (as estimated by Seller and subject to reproration when the actual tax bill is available) for the Unit from the date of closing through the end of the applicable calendar year of closing. If taxes for the year of closing are assessed on a unit-by-unit basis, Purchaser and Seller shall prorate taxes as of the closing date based upon the actual tax bill, if available, or an estimate by Seller, if not available, with Purchaser responsible for paying the full amount of the tax bill and Seller reimbursing Purchaser for Seller's prorated share of those taxes. Purchaser agrees that

6

4844-9934-1059.01

Seller's prorated share of the taxes due as of closing need not be paid to Purchaser, however, until the actual tax bill is presented to Seller, and any proration based on an estimate of the current year's taxes shall be subject to reproration upon request of either party. This subsection 11(g) shall survive (continue to be effective) after closing.

12. _Adjustments with the Association_. Purchaser understands that Seller may advance money to the Association to permit it to pay for certain of its expenses (for example, but without limitation, insurance premiums, utility and/or cable or other interactive communication charges and deposits, permit and license fees, charges for service contracts, salaries of employees of the Association and other similar expenses). Seller is entitled to be reimbursed by the Association for all of these sums advanced by Seller. The Association will reimburse Seller out of regular assessments or initial capital contributions paid by Purchaser and other owners as those assessments and contributions are collected, or as otherwise requested by Seller. Seller also, at its election, may receive reimbursement for these payments by way of a credit against any sums it may become obligated to pay to the Association.

13. _Default_. Should Purchaser fail to timely make any of the payments due hereunder, as hereinabove scheduled, or fail or refuse to execute the instruments required to close this transaction on the scheduled date, or refuse to pay any costs or other sums as and when required by this Agreement, or fail to perform any of Purchaser's obligations hereunder or otherwise breach any term of this Agreement, then Purchaser will be in default of this Agreement (hereinafter referred to as a "Default"). If Purchaser is still in Default twenty (20) days after receipt from Seller of written notice thereof, Seller may declare this Agreement terminated and, may retain all Deposit money, as liquidated and agreed upon damages which Seller shall be deemed to have sustained and suffered as a result of such Default; provided, however, in no event shall the amount of the Deposit money retained by Seller exceed fifteen percent (15%) of the purchase price, exclusive of interest, or the amount of the Seller's actual damages, whichever is the greater. To the extent that the Deposit money exceeds such amount, such excess shall be returned to Purchaser. Upon such termination, the parties hereto will be released and relieved from all obligations hereunder. The provisions herein contained for liquidated and agreed upon damages are bona fide provisions for such and are not a penalty, the parties understanding and agreeing that Seller will have sustained damages if a Default occurs, which damages will be substantial but will not be capable of determination with mathematical precision and, therefore, the provision for liquidated and agreed upon damages has been incorporated in this Agreement, as a provision beneficial to both parties. Upon Purchaser's Default and termination by Seller of this Agreement pursuant to this section 13, all of Purchaser's rights under this Agreement shall cease and Seller may sell or hold the Unit without any accounting or further notification to Purchaser.

If Seller fails to perform any of Seller's obligations under this Agreement, Seller will be in "default". If Seller is still in default ten (10) days after Purchaser sends Seller notice thereof (or such longer time as may reasonably be necessary to cure the default if same cannot be reasonably cured within ten (10) days), Purchaser will have such rights as may be available in equity and/or under applicable law.

14. _Construction Specifications_. The Unit and the Condominium will be constructed in substantial accordance (in Seller's opinion) with the plans and specifications therefor, as such plans and specifications are amended from time to time. Seller may make such non-material changes to or deviations from the plans and specifications as Seller deems appropriate at any time. Purchaser expressly agrees that for purposes of this Agreement, the following types of

7

4844-9934-1059.01

changes or deviations shall be deemed non-material: changes to or deviations from the plans or specifications to accommodate Sellers's design and construction needs (as more fully discussed in this section 14) including changes to construct fewer or additional Units, floors or parking facilities (commensurate with changes to the number of floors or Units) within the Condominium; changes to or deviations from the plans or specifications in response to recommendations or requirements of local, state or federal governmental or quasi-governmental agencies or applicable utility and/or insurance providers; engineering and design changes to the exterior or interior of the Unit and/or the Condominium (including but not limited to structural changes or changes to systems such as electrical or HVAC); changes in the manufacturer of appliances, fixtures, and other items and materials to be incorporated into or installed in the Unit; and changes in the manufacturers and suppliers of building materials and components. The above mentioned plans and specifications, including amendments thereto and including the design and engineering elements incorporated therein, are referred to in this Agreement as "Seller's Plans and Specifications." Without limiting Seller's general right to make changes, Purchaser specifically agrees that the changes described above and changes in the dimensions of rooms, patios and balconies, in the location of windows, doors, walls, partitions, utility (including, but not limited to, television and telephone) lead-ins and outlets, air-conditioning equipment, ducts and components, lighting fixtures and electric panel boxes, and in the general layout of the Unit and Condominium, may be made by Seller in its discretion and that such changes shall not be deemed material or adverse to Purchaser.

In furtherance of the understanding and agreement stated above, Purchaser acknowledges and agrees that it is widely observed construction industry practice for preconstruction plans and specifications for any Unit or building to be changed and adjusted from time to time in order to accommodate ongoing, "in the field" construction needs. Purchaser further acknowledges that it is desirable that Seller have the flexibility to revise the structural and systems engineering and design of the Unit and/or the Condominium, to conform with and implement the professional advice and opinions of Purchaser's engineers, architects and other professional consultants. These changes and adjustments are essential in order to permit all components of the Unit and the building to be integrated into a well-functioning and aesthetically pleasing product in an expeditious manner. Because of the foregoing, Purchaser acknowledges and agrees that it is to Purchaser's benefit to allow Seller the flexibility to make such changes in the Unit and the Condominium. Purchaser further acknowledges and agrees that (i) the drafts of the preliminary drawings from which the Plat and Plans for the Condominium will be prepared, which drafts of such preliminary drawings are attached to the Public Offering Statement, showing the Plans for the Unit and the Condominium, are preliminary only and may change as the Seller's Plans and Specifications change, and may not be identical to building plans and specifications submitted to applicable governmental authorities for permitting purposes, and may include fewer or additional Units, floors and/or parking facilities (commensurate with changes to the number of Units or floors); and (ii) the final Plat and Plans filed in the Office of the Register of Deeds for Mecklenburg County will not be, and are not required to be, "as-built" plans of the Units and the Condominium, except to the extent required by the Act, and may thus vary from the Unit and Condominium "as-built," and may furthermore differ from building plans and specifications submitted to applicable governmental authorities for permitting purposes. As a result of the foregoing, Purchaser and Seller both acknowledge and agree: The Unit and the Condominium may not be constructed in accordance with the plans and specifications filed with applicable governmental authorities for permitting purposes. SELLER DISCLAIMS AND PURCHASER WAIVES ANY AND ALL EXPRESS OR IMPLIED WARRANTIES THAT CONSTRUCTION WILL BE ACCOMPLISHED IN COMPLIANCE WITH SUCH PLANS

8

4844-9954-1059.01

AND SPECIFICATIONS. SELLER HAS NOT GIVEN AND PURCHASER HAS NOT RELIED ON OR BARGAINED FOR ANY SUCH WARRANTIES.

Without limiting the generality of the foregoing, because of Seller's need to coordinate the appearance and design of the overall development of the Condominium, both in connection with the nature and layout of the land on which construction is to take place and of the street, common areas and other features of the development, Purchaser understands and agrees: The Unit may be constructed as a reverse ("mirror image") of that drawn in the draft of the Plans attached to the Public Offering Statement and may be "sited" in a position different from that shown on the drafts of preliminary drawings from which the Plat and Plans are to be prepared, which preliminary drawings are attached to the Public Offering Statement. Purchaser agrees to accept the Unit and the building as "sited" by Seller and as constructed according to a reverse floor and/or building plan. This section 14 does not limit the generality of Seller's rights, set out elsewhere in this Agreement, to make other changes in the Unit, the Condominium and the Condominium Documents.

Purchaser understands and agrees that in designing the Condominium, the stairwells of the Building were intended solely for ingress and egress in the event of emergency and, as such are constructed and left unfinished solely as to be functional for said purpose, without regard to the aesthetic appearance of said stairwells. Further, Purchaser hereby acknowledges and agrees that sound and smell transmission in a high-rise building such as the Condominium is very difficult to control, and that noises and smells from adjoining or nearby units, trash chutes and/or mechanical equipment can often be detected within other nearby units. Aluminum windows installed in the Unit may make "popping" sounds as they expand/contract with weather changes. All of the above being the case, Seller does not make any representation or warranty as to the level of sound or smell transmission between, among or within units and the other portions of the Condominium Property, and Purchaser hereby waives and expressly releases any such warranty and claim for loss or damages resulting from the same.

Purchaser agrees and understands that the performance and methods and practices of operating heating and cooling systems can be directly affected by the orientation and location of a room or unit in relation to the sun. Seller shall, therefore, have no obligation other than to install a heating and cooling system serving the Unit which has been sized and designed based on industry standards for the type and size of unit to be constructed.

Purchaser further agrees and understands that trees and landscaping which are located on portions of the Condominium Property may be removed to accommodate construction. Seller does not guarantee the survival of any trees and landscaping which are left or planted on any portion of the Condominium Property.

Purchaser further agrees and understands: (i) that certain non-structural, cosmetic variations may occur in Units as a result of normal construction procedures, of settling of the building in which the Unit is located, and as a result of tendency of high rise buildings to move or sway; and (ii) that such variations shall not constitute construction defects or matters which Seller shall be obligated to correct. Examples of such variations include, without limitation, cracks in grout, cracks in tile flooring, cracks in walls and ceilings and similar matters.

The agreements and waivers of Purchaser contained in this section 14 will survive (continue to be effective after) closing.

9

4844-9934-1059.01

15.   Certain Items and Materials.  Purchaser understands, acknowledges and agrees that certain items, such as the following, which may be seen in models (if any) or in illustrations, are not included with the sale of the Unit:  wall coverings (including paint other than base primer), accent light fixtures, wall ornaments, drapes, blinds, furniture, knickknacks and other decorator accessories, lamps, mirrors, graphics, pictures, plants, wall-hung shelves, wet bars, intercoms, kitchen accessories, linens, window shades, security systems, certain built-in fixtures, carpets or other floor coverings and colors, wood trim, other upgraded items, balcony treatments (e.g. scored concrete or wood trim), barbecues, planters, window screens, landscaping and any other items of this nature which may be added or deleted by Seller from time to time.  This list of items (which is not all-inclusive) is provided as an illustration of the type of items built-in or placed upon the models (if any) or shown in illustrations strictly for the purpose of decoration and example only.  Items such as these will not be included in the Unit unless specifically provided for in a Rider or Schedule to this Agreement signed by both Purchaser and Seller.  Certain of these items may not even be available.  In the event that Seller does provide any of these or other items, however, Purchaser agrees to accept them, although not requested by Purchaser, as long as Purchaser is not required to pay for such items.  There is no obligation for Seller to provide models, but if so provided, the foregoing disclaimers will apply.

Purchaser further understands, acknowledges and agrees that certain items or products, if included with the Unit, such as granite, marble, tile, cabinets, wood, paint, stain, grout, wall and ceiling textures, cultured marble, mica, carpeting, appliances, and light, plumbing or other fixtures, as a result of their naturally occurring characteristics or manufacturing processes, are subject to size and color variations, grain and quality variations, and may further vary in accordance with price, availability and changes by manufacturer from those shown in the models or in illustrations or included in Seller's Plans and Specifications or in the published list of standard items (if any).  By way of example (and without limitation):  wood taken from two trees of the same species growing one beside the other may have unique and different grain patterns, grain markings, and perhaps individual markings; no two granite slabs (granite having been formed by the natural process of molten rock cooling and crystallizing deep in the earth) will be identical in color and pattern; and carpeting or appliances may differ in size, shape, look or feel from one model to the next, or even from one sample to the next, depending upon manufacturers determinations and processes.

In particular and without limiting the above, due to the large quantity of paint used in the Condominium, Purchaser should be aware that slight variations in paint shade may exist from unit to unit.  Environmentally safe paints are used on all cabinets, kitchen, bath room and laundry room walls.  Due to the properties within today's paints, Purchaser should expect paint to yellow somewhat with time.  This is a normal occurrence and is therefore not covered as a warranty issue.  Purchaser is advised to avoid washing or scrubbing painted walls.  Lightly soiled areas may be cleaned using a sponge with water and lightly wiping over the soiled areas.

Purchaser realizes and understands that its Unit, like other units, may trap humidity created by general use and occupation of its space (cooking, bathing, laundering, etc.).  As a result, condensation may appear on the interior portion of windows and glass surfaces and fogging of windows and glass surfaces may occur due to temperature disparities between the interior and exterior portions of the windows and glass.  If left unattended and not properly maintained by the Unit owner or occupant, the condensation may increase resulting in staining, damage to surrounding seals, caulk, paint, wood work and sheetrock, and potentially, mildew and/or mold.  Seller shall have no liability for any such damage.

10

4844-9934-1059.01

Purchaser further realizes and understands that all buildings contain products that have water, powders, solids and industrial chemicals, which will be used in construction. The water, powders, solids and industrial chemicals will and do contain mold, mildew, fungus, spores and chemicals that may cause allergic or other bodily reactions in certain individuals. Leaks, wet flooring and moisture will contribute to the growth of molds, mildew, fungus or spores. Each Purchaser understands and agrees that Seller is not responsible for any illness or allergic reactions that a Purchaser may experience as a result of mold, mildew, fungus or spores. It is the responsibility of the Purchaser to keep the Unit clean, dry, well ventilated and free of contamination.

Purchaser understands, acknowledges and agrees that Seller may determine, in Seller's sole discretion, that circumstances warrant a change of suppliers, manufacturers, brand names or items, and upon making any such determination, Seller shall have the right to substitute equipment, material, appliances, and the like, so long as the substitute equipment, material, appliances are of substantially the same quality (regardless of cost), in Seller's opinion. Purchaser also understands, acknowledges and agrees that Seller has the right to substitute or change materials and/or stain colors utilized in wood decor (if any), in Seller's sole discretion. Purchaser expressly recognizes that certain colors as shown in displays or in the models, including, but not limited to, carpeting and wood stain, will weather and fade and may not be duplicated precisely. In addition to the foregoing, Purchaser understands that certain of the materials described in this section 15, including but not limited to marble and stone, may have dangerously slippery finishes and Seller shall have no liability for any injuries sustained as a result of exposure to or use of such materials.

If Seller allows Purchaser to select certain colors and/or materials in the Unit (which Seller is not obligated to do), Purchaser shall submit his selections to Seller in writing within fourteen (14) days after the date that the list of selections (if any) is made available to Purchaser. If Purchaser's selections (if any) are not delivered to Seller in writing within the time period stated above, then Purchaser understands, acknowledges and agrees that the choices will be made for Purchaser by Seller, in Seller's sole discretion.

The agreements and waivers of Purchaser contained in this section 15 will survive (continue to be effective after) closing.

16.    Condominium Annual Assessments.  Purchaser understands and agrees that the Estimated Operating Budget for the Condominium Association (the "Budget") attached to the Public Offering Statement provides only an estimate of what it will cost to run the Association and to operate and maintain the facilities during the period of time stated in the Budget. These assessments and costs are not guaranteed in any manner. There may be changes in the Budget at any time to cover increases or decreases in actual expenses or in estimates. The Budget does not provide for reserves. The directors of the Association appointed by Seller, during the "period of Developer (declarant) control" provided for in the Declaration, will not include reserves in any proposed subsequent budget of the Association.    Thereafter, on an annual basis, the Association's members will vote, in accordance with the Bylaws of the Association and the Act, whether to continue not to provide any reserves for the Condominium, or whether to establish reserves. Seller does not intend to exercise the vote allocated to any Units owned by Seller to establish reserves .  If an election is to provide reserves is made, the assessments per Unit payable to the Condominium Association will be higher.

11

4844-9934-1059.01

17.    Condominium Association.  At closing, Purchaser agrees to accept the liabilities and obligations of membership in the Association.

18.    Seller's Use of the Condominium Property.  As long as Seller is offering a Unit or Units for sale in the ordinary course of business, it and its agents can keep offices and model apartments within the Condominium Property.  Seller's salespeople can show these units, erect advertising signs and do whatever else is necessary in Seller's opinion to help sell or lease Units or develop and manage the Condominium Property but Seller's use of the Condominium Property must be reasonable, in Seller's opinion, and cannot unreasonably interfere, in Seller's opinion, with Purchaser's use and enjoyment of the Unit.  This section 18 will survive (continue to be effective after) closing.

19.    Brokers.  Seller represents and warrants to Purchaser that Seller has not dealt with nor has the sale been procured by a broker representing Seller other than **Morris & Raper Realtors**.  Purchaser represents and warrants to Seller that Purchaser has not dealt with, nor has the sale been procured by, any real estate broker, salesman or finder, other than the salespersons (including in-house staff salespersons) retained by Seller, and the cooperating broker identified as **NONE** (the "Cooperating Broker").  IF NO COOPERATING BROKER'S NAME APPEARS IN THE PRECEDING SENTENCE OR IF "NONE" IS LISTED IN THE CORRESPONDING BLANK FOR THE NAME OF THE COOPERATING BROKER, THEN IT SHALL BE DEEMED THAT PURCHASER HAS NOT BEEN REPRESENTED BY A BROKER.  Purchaser will indemnify Seller and hold Seller harmless for and against all claims made against Seller by any other brokers or sales agents other than the Cooperating Broker, and Purchaser shall pay all costs and attorneys' fees actually incurred by Seller as a result of any such claims.

This section 19 will survive (continue to be effective after) closing.

20.    Notices.  Whenever Purchaser is required or desires to give notice to Seller, the notice must be in writing and it must be sent certified mail, postage prepaid, with a return receipt requested to Seller at the sales office at c/o MCL Companies, 455 E. Illinois, Suite 565, Chicago, IL  60611.  Notwithstanding the foregoing, Purchaser's right to cancel within seven (7) calendar days after the signing of this Agreement pursuant to Section 47C-4-108 of the North Carolina General Statutes, as described in section 24 below, may be noticed by any means allowed by law.

Unless this Agreement states other methods of giving notices, whenever Seller is required or desires to give notice to Purchaser, the notice must be given either in person, by telephone or in writing and, if in writing, it must be sent either by:  (i) certified mail, postage prepaid, with a return receipt requested (unless sent outside of the United States, in which event written notices to Purchaser may be sent by regular air mail); (ii) facsimile transmission if Purchaser has indicated a telecopy number on page 1 of this Agreement; (iii) electronic transmission if Purchase has indicated an email address on page 1 of this Agreement, or (iv) a recognized overnight courier service (i.e., FedEx, Express Mail, Airborne, Emory, Purolator, United Parcel Service, etc.), to the following address or addresses for Purchaser:  **315 Arlington Avenue #1906, Charlotte, NC 28203**_____.

A change of address notice is effective when it is received.  All other written notices are effective on the day they are properly given or mailed, whether or not received (and all permitted non-written notices to Purchaser are effective on the date given by Seller) unless receipt is required specifically in portions of this Agreement.

12

4844-9934-1059.01

21.     Transfer or Assignment.    Without limiting any of Seller's assignment or delegation rights under the law, Seller expressly reserves the right to assign this Agreement, and all rights and obligations hereunder, as collateral for any loan or financing associated with the construction of the Condominium.  Purchaser shall not be entitled to assign this Agreement or its rights hereunder without the prior written consent of Seller, which may be withheld by Seller with or without cause (and even if Seller's refusal to grant consent is unreasonable).  To the extent that Seller consents to any such assignment, said consent may be conditioned in any manner whatsoever, including, without limitation, charging an assignment or transfer fee.  Any assignee must fully assume all of the obligations of Purchaser hereunder by written agreement for Seller's benefit, a counterpart original executed copy of which shall be delivered to Seller.  For purposes of this section 21, the sale, transfer or pledge of any beneficial interest in Purchaser shall be deemed an assignment hereunder requiring prior consent of Seller.  Without limiting the generality of the foregoing, Purchaser shall not, prior to closing on title to the Unit, list the Unit for resale with a broker or allow the Unit to be listed on the Multiple Listing Service for resale (but may list the Unit for rent).

Notwithstanding the foregoing, without requiring the consent of Seller, Purchaser shall be permitted to assign its rights and obligations under this Agreement and its interest in the Unit to any immediate family member, any trust for the benefit of Purchaser and/or its immediate family members and/or any corporation, partnership or other entity which is wholly beneficially owned by Purchaser (or its immediate family members), provided only that the assignee assumes in writing, for the benefit of Seller, all of Purchaser's duties and obligations under the Agreement and said assumption is delivered to Seller promptly following said assignment and in no event less than fifteen (15) days prior to closing.  Notwithstanding the foregoing, said assignment shall not release Purchaser from any of its obligations under the Agreement.

22.     Others Bound by this Agreement  If Purchaser dies or in any way loses legal control of his affairs, this Agreement will bind his heirs and personal representatives.  If Purchaser has received permission to assign or transfer his interest in this Agreement, this Agreement will bind anyone receiving such interest.  If Purchaser is a corporation or other business entity, this Agreement will bind any successor corporation or entity.  If more than one person signs this Agreement as Purchaser, each will be equally liable, on a joint and several basis, for full performance of all Purchaser's duties and obligations under it and Seller can enforce it against either as individuals or together.

23.     Public Records.  Purchaser authorizes Seller to record the documents needed to establish and operate the Condominium, as well as all other documents which Seller deems necessary or appropriate, in the Office of the Register of Deeds of Mecklenburg County, North Carolina.  Neither this Agreement, nor any notice or memorandum hereof (nor any Lis Pendens), may be recorded.

24.     Termination Rights.

(a)     Buyer's Termination Rights.  THIS AGREEMENT MAY BE TERMINATED BY BUYER, IN BUYER'S SOLE DISCRETION, BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENT TO TERMINATE WITHIN SEVEN (7) CALENDAR DAYS AFTER THE DATE OF EXECUTION OF THIS AGREEMENT.  IN THE EVENT OF SUCH TERMINATION, THE DEPOSIT SHALL BE RETURNED TO BUYER.

(b)     Seller's Termination Rights.  [Intentionally Deleted.]

13

4844-9934-1059.01

(c)     Effect of Termination.  Termination under this section 24 is without penalty, and if this Agreement is terminated under this section, neither party shall have any further rights or obligations hereunder.

25.     North Carolina Law; Severability.     Any disputes that develop under this Agreement, and any issues that arise regarding the entering into, validity and/or execution of this Agreement, will be settled according to North Carolina law.  If any part of this Agreement violates a provision of applicable law, the applicable law will control.  In such case, however, the rest of the Agreement (not in violation) will remain in force.

Without limiting the generality of the foregoing, it is Purchaser's and Seller's mutual desire and intention that all provisions of this Agreement be given full effect and be enforceable strictly in accordance with their terms.  If, however, any part of this Agreement is not enforceable in accordance with its terms or would render other parts of this Agreement or this Agreement, in its entirety, unenforceable, the unenforceable part or parts are to be judicially modified, if at all possible, to come as close as possible to the expressed intent of such part or parts (and still be enforceable without jeopardy to other parts of this Agreement, or this Agreement in its entirety), and then are to be enforced as so modified.  If the unenforceable part or parts cannot be so modified, such part or parts will be unenforceable and considered null and void in order that the mutual paramount goal (that this Agreement is to be enforced to the maximum extent possible strictly in accordance with its terms) can be achieved.

Without limiting the generality of the foregoing, if the mere inclusion in this Agreement of language granting to Seller certain rights and powers, or waiving or limiting any of Purchaser's rights or powers or Seller's obligations (which otherwise would be applicable in the absence of such language), results in a final conclusion (after giving effect to the above judicial modification, if possible) that Purchaser has the right to cancel this Agreement and receive a refund of his deposits, such offending rights, powers, limitations and/or waivers shall be struck, canceled, rendered unenforceable, ineffective and null and void.  Under no circumstances shall either Purchaser or Seller have the right to cancel this Agreement solely by reason of the inclusion of certain language in this Agreement (other than language which is intended specifically to create such a cancellation right).

26.     Time of Essence.  The performance of all obligations by Purchaser on the precise times stated in this Agreement is of absolute importance and failure to so perform on time is a default, time being of the essence.

27.     DISCLAIMER OF WARRANTIES.  EXCEPT AS EXPRESSLY STATED IN WRITING OR AS OTHERWISE REQUIRED BY THE TERMS OF §47C-4-113 OF THE ACT, SELLER MAKES NO EXPRESS WARRANTIES WITH RESPECT TO THE SALE OF ANY UNIT.  EXCEPT AS REQUIRED, AND ONLY TO THE EXTENT REQUIRED IN §47C-4-114 OF THE ACT, WHICH PROVIDES WITHOUT LIMITATION THAT, THE UNIT, SHALL BE "FREE FROM DEFECTIVE MATERIALS, CONSTRUCTED IN A WORKMANLIKE MANNER, CONSTRUCTED ACCORDING TO SOUND ENGINEERING AND CONSTRUCTION STANDARDS, AND SUITABLE FOR [RESIDENTIAL USE]," SELLER DISCLAIMS ALL IMPLIED WARRANTIES, INCLUDING WITHOUT LIMITATION the WARRANTY OF HABITABILITY OR QUALITY OF WORKMANSHIP, TO THE EXTENT ALLOWED BY NORTH CAROLINA LAW.

14

4844-9934-1059.01

WITHOUT LIMITING ANY OF THE ABOVE, SELLER EXPRESSLY DISCLAIMS ANY AND ALL WARRANTIES (EXPRESS OR IMPLIED) WITH REGARD TO THE CONDOMINIUM AND THE UNITS AND COMMON ELEMENTS THEREIN, INCLUDING WITHOUT LIMITATION THE WARRANTY OF HABITABILITY OR QUALITY OF WORKMANSHIP, AND INCLUDING BUT NOT LIMITED TO WARRANTIES WITH RESPECT TO THE APPLIANCES, HEATING AND AIR CONDITIONING SYSTEMS, ELEVATORS, HEAT PUMPS, WATER HEATERS, WATER OR SEWER SYSTEMS, ELECTRIC SYSTEMS, PLUMBING FIXTURES, LIGHTING FIXTURES, STRUCTURAL ELEMENTS OF THE BUILDING (INCLUDING BUT NOT LIMITED TO THE EXTERIOR SKIN OF THE BUILDING AND THE WINDOW WALL SYSTEMS IN THE BUILDING), DESIGN FLAWS, EQUIPMENT, PERSONAL PROPERTY LOCATED IN THE CONDOMINIUM, VIEWS FROM UNITS, SOUND AND/OR ODOR TRANSMISSION, THE EXISTENCE OF MOLDS, MILDEW, SPORES, FUNGI AND/OR OTHER TOXINS WITHIN THE CONDOMINIUM, STATEMENTS OR REPRESENTATIONS MADE BY SALES CENTER REPRESENTATIVES, AND REPRESENTATIONS CONTAINED IN SALES OR MARKETING MATERIALS (WHICH MATERIALS DO NOT INCLUDE THIS PUBLIC OFFERING STATEMENT AND THE CONDOMINIUM DOCUMENTS) DISTRIBUTED BY SELLER OR ITS SALES REPRESENTATIVES (INCLUDING BUT NOT LIMITED TO REPRESENTATIONS REGARDING POTENTIAL APPRECIATION OR RESALE VALUE; CURRENT OR FUTURE "VIEWS" FROM A UNIT; TRAFFIC CONDITIONS IN, NEAR OR AROUND THE CONDOMINIUM; DISTURBANCES FROM NEARBY PROPERTIES OR FROM AIR OR VEHICULAR TRAFFIC; OR FUTURE USE(S) OF ADJACENT PROPERTIES). IN ADDITION, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES AS TO THE CONDITION OR HEALTH OF ANY SHRUBS, TREES, OR PLANTINGS LOCATED WITHIN THE CONDOMINIUM, BUT WILL DELIVER TO THE ASSOCIATION ANY NURSERY'S WARRANTIES (IF ANY) WITH RESPECT TO SUCH SHRUBS, TREES OR PLANTINGS. AS TO ANY WARRANTY WHICH CANNOT BE DISCLAIMED ENTIRELY, ALL SECONDARY, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE, AND SPECIAL DAMAGES, AND ALL CLAIMS FOR TREBLE DAMAGES, ARE SPECIFICALLY EXCLUDED AND DISCLAIMED.

TO THE EXTENT ASSIGNABLE BY THEIR TERMS, SELLER SHALL ASSIGN AND TRANSFER TO PURCHASER AT CLOSING ALL OF SELLER'S RIGHT, TITLE AND INTEREST IN AND TO ANY AND ALL WARRANTIES RELATING TO THE UNIT AND IMPROVEMENTS THEREIN (WITH SELLER RETAINING ALL WARRANTY PROTECTIONS THAT RELATE TO IMPROVEMENTS AND MATERIALS USED IN ALL OTHER PORTIONS OF THE CONDOMINIUM OTHER THAN THE UNIT) THAT ARE RECEIVED BY SELLER FROM MANUFACTURERS SUPPLYING MATERIALS USED AND CONTRACTORS PERFORMING WORK IN THE UNIT (SPECIFICALLY INCLUDING ANY WARRANTY RECEIVED BY SELLER FROM THE GENERAL CONTRACTOR). THE WARRANTY PERIOD IS DEFINED IN EACH WARRANTY AND SHALL BEGIN TO RUN FROM A DATE WHICH MAY BE A DIFFERENT DATE THAN THE DATE OF CLOSING.

TO THE EXTENT ALLOWED BY LAW, AND WITHOUT LIMITING THE FOREGOING, SELLER AND PURCHASER SHALL AGREE TO WAIVE THE FOLLOWING: (1) THE RIGHT TO JOIN THE CLAIMS OF MULTIPLE CLAIMANTS IN A SINGLE PROCEEDING OR CERTIFY A CLASS ACTION OR SIMILAR PROCEEDING; (2) AWARD OF PUNITIVE OR EXEMPLARY DAMAGES OF ANY SORT; AND (3) AWARD

15

4844-9934-1059.01

OF TREBLE DAMAGES OR ANY OTHER DAMAGES WHICH ARE GREATER THAN COMPENSATORY DAMAGES OR WHICH ARE BASED ON A MULTIPLE OF COMPENSATORY DAMAGES. FURTHERMORE, AS TO ANY WARRANTIES WHICH CANNOT BE DISCLAIMED, PURCHASER hereby WAIVES AND DISCLAIMS ALL SECONDARY, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE AND SPECIAL DAMAGES, AND ALL CLAIMS FOR TREBLE DAMAGES, ARISING FROM OR IN CONNECTION WITH SUCH WARRANTIES WHICH CANNOT BE DISCLAIMED.

THIS SECTION 27 WILL SURVIVE (CONTINUE TO BE EFFECTIVE AFTER) CLOSING.

28.   Return of Condominium Documents.   If this Agreement is canceled for any reason, Purchaser will return to Seller all of the Condominium Documents delivered to him in the same condition received, reasonable wear and tear excepted. If Purchaser fails to return the Condominium Documents, Purchaser agrees to pay Seller $50.00 to defray the costs of preparation, printing and delivery of same.

29.   Waiver.   Seller's waiver of any of its rights or remedies (which can only occur if Seller waives any right or remedy in writing) will not waive any other of Seller's rights or remedies or prevent Seller from later enforcing all of Seller's rights and remedies under other circumstances.

30.   Survival.   Only those provisions and disclaimers in this Agreement which specifically state that they shall have effect after closing will survive (continue to be effective after) closing and delivery of the deed. All other provisions shall be deemed merged into the deed.

31.   Substantial Completion; Seller As Developer.   Whenever this Agreement requires Seller to complete or substantially complete an item of construction, that item will be understood to be complete or substantially complete when so completed or substantially completed in Seller's opinion. Notwithstanding the foregoing, however, the Unit will not be considered complete or substantially complete for purposes of this Agreement unless the Unit and such portion of the building intended to be used exclusively by Purchaser is physically habitable and useable for the purpose for which the Unit was purchased. The Unit (and such portion of the building) will be considered so useable if the Unit is ready for occupancy and has all necessary and customary utilities extended to it. Other units (and other portions of the building) may not necessarily be so complete and useable.

Notwithstanding any express language or implication herein to the contrary, Seller is the developer of the Condominium, but Seller is not in the construction, engineering or building design business and Seller does not hold itself out as being in any such businesses. Seller will hire an engineer/architect to design the improvements described herein and in the Condominium Documents and Seller will hire a general contractor to construct all such improvements. Seller shall not itself design or construct or warrant the design or construction of any such improvements. Any statement to the effect that Seller will meet certain design and construction deadlines or otherwise meet design or construction obligations shall be read to mean that Seller shall cause its architects/engineers or general contractor to meet said deadlines/obligations.

32.   Nearby Construction.   Purchaser understands and agrees that for some time in the future Purchaser may be disturbed by the noise, commotion and other unpleasant effects of

16

4844-9934-1059.01

nearby construction activity and impeded in using portions of Condominium Property by that activity. As a result of the foregoing, there is no guarantee of view, security or privacy.

33.    Radon.    Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in North Carolina. Additional information regarding radon and radon testing may be obtained from your county health department.    The foregoing notice is provided for informational purposes only. Seller does not conduct radon testing with respect to the Units or the Condominium, and specifically disclaims any and all representations or warranties as to the absence of radon gas or radon producing conditions in connection with the Condominium.

34.    Representations.    Buyer acknowledges, warrants, represents and agrees that this Agreement is being entered into by Buyer without reliance upon any representations concerning any potential for future profit, any future appreciation in value, any rental income potential, tax advantages, depreciation or investment potential and without reliance upon any monetary or financial advantage. Buyer acknowledges and agrees that no such representations, including representations as to the ability or willingness of Seller or its affiliates to assist Buyer in renting or selling the Unit, have been made by Seller, or any of its agents, employees or representatives. Buyer further represents and warrants to Seller that Buyer is entering into this Agreement with the full intention of complying with each and every of the obligations hereunder, including, without limitation, the obligation to close on the purchase of the Unit. Neither Seller, nor anyone working by, through or under Seller, has made any statement or suggestion that Buyer would not be obligated to fully comply with the terms of this Agreement and to close on the purchase of the Unit. Further, Buyer understands and agrees that neither Seller, nor any brokerage company, on site sales personnel and/or other persons working by, through or under Seller, are under any obligation whatsoever to assist Buyer with any resale of the Unit.

This Agreement contains the entire understanding between Buyer and Seller, and Buyer hereby acknowledges that the displays, architectural models, artist renderings and other promotional materials contained in the sales office and model suite are for promotional purposes only and may not be relied upon. Buyer warrants that Buyer has not relied upon any verbal representations, advertising, marketing materials, brochures, website information, portrayals or promises other than as expressly contained herein and in the Condominium Documents, including, specifically, but without limitation, any representations as to:    (a) potential appreciation in or resale value of the Unit, (b) the existence of any "view" from the Unit or that any existing "view" will not be obstructed in the future, (c) traffic conditions in, near or around the Condominium, (d) disturbance from nearby properties, (e) disturbance from air or vehicular traffic, or (f) any future use of adjacent properties. Without limiting the foregoing, Buyer further acknowledges that Seller may construct fewer or additional floors, Units and/or parking facilities (commensurate with changes to the number of Units or floors) in the Condominium, which fewer or additional floors, Units and/or parking facilities may or may not be shown in currently available marketing materials or models.

The provisions of this section 34 shall survive the closing.

35.    Incorporation of Definitions.    The explanations, definitions, disclaimers and other provisions set forth in the Condominium Documents are incorporated into this Agreement as if repeated at length here. When the words "this Agreement" are used, they shall include in their meaning all modifications, riders and addenda to it signed by Purchaser and Seller. The term

17

4844-9934-1059.01

"Force Majeure" as used in this Agreement shall mean "Acts of God", labor disputes (whether lawful or not), material or labor shortages, restrictions by any governmental or utility authority, civil riots, floods or other causes beyond Seller's control.

36. <u>Entire Agreement</u>. This Agreement is the entire contract for sale and purchase of the Unit and once it is signed, it can only be amended by a written instrument signed by the party against whom enforcement is sought which specifically states that it is amending this Agreement. Any current or prior Agreements, representations, understandings or oral statements of sales representatives or others, if not expressed in this Agreement, the Condominium Documents or in brochures for the Condominium, are void and have no effect. Purchaser has not relied on them.

37. <u>Cooperating Broker</u>. Buyer's broker shall be that broker whose name appears with Buyer's name(s) on page 2 of this Contract ("Cooperating Broker"). Purchaser warrants and represents that Purchaser has not hired, used, or engaged any other broker in conjunction with this transaction and Purchaser further agrees to indemnify Seller, hold Seller harmless, and defend Seller against any claims by any other brokers with respect to this transaction.

38. <u>Calculation of Time Periods</u>. In computing time periods of less than six (6) days, Saturdays, Sundays and state or national legal holidays shall be excluded. Any time periods provided for herein which shall end on a Saturday, Sunday or state or national legal holiday shall extend to 5:00 p.m. (Eastern time) on the day which is not a Saturday, Sunday or state or national legal holiday.

39. <u>Subordination to Institutional Lenders</u>. Purchaser's rights under this Contract and in the land on which the Condominium is located are hereby expressly subordinated to the rights and interests of any institutional lender which extends financing in connection with the Condominium, including, without limitation, any institutional lender holding a mortgage on the property on which the Condominium is located and any institutional lender providing mezzanine financing, whether such financing is secured by an interest in the property, an interest in the limited liability company which is the Seller, or some other form of security. Purchaser agrees to execute such further documentation evidencing the subordination of its interest per this section 39 as Seller shall reasonably request.

40. <u>Disputes; Time Limitations on Actions; Damages</u>. Notwithstanding any provision of law (including any statute of limitations or repose) to the contrary, Purchaser and Seller agree that any claim or part of any claim arising out of this Agreement or the transaction contemplated by this Agreement, or relating to any claim under an implied warranty, or any claim relating to the construction of the Unit of the Condominium, must be asserted, if at all, not later than one (1) year following the date that the essential facts giving rise to the claim or part thereof were or reasonably should have been discovered, provided, however, in no event shall any claim or matter be valid unless it is asserted within three (3) years after the last act of the respondent giving rise to the claim.

To the extent allowed by law, the parties hereby waive the following: (1) the right to join the claims of multiple claimants in a single proceeding or certify a class action or similar proceeding; (2) award of punitive or exemplary damages of any sort; and (3) award of treble damages or any other damages which are greater than compensatory damages or which are based on a multiple of compensatory damages.

This provision shall survive closing.

18

4844-5934-1059.01

41.    Termination of Other Agreements; Effective Date.  In the event that Purchaser and Seller have previously contracted for the purchase and sale of the Unit, or for any other unit pursuant to a written agreement (the "Initial Agreement"), this section 41 shall constitute written notice of Seller's intent to terminate said Initial Agreement.  By execution of this Agreement, Purchaser acknowledges that prior to execution of this Agreement, Purchaser received a copy of the Property Report (described on the cover page of this Agreement) as required by federal law.  The parties' execution hereof shall constitute an absolute termination of the Initial Agreement, it being clear that there is no intent by either party that this Agreement relate back in any way to the Initial Agreement.  The effective date of this Agreement shall be the date upon which this Agreement is executed by both Purchaser and Seller, said date (and no prior agreement date) being the date upon which the parties agreed to the terms hereof.

42.    Access, Utilities and Completion of Development.  Seller is hereby contractually bound to Purchaser to construct any and all paved drive(s) or road(s) which will provide access to and from the Condominium to the nearest public right-of-way; to install utilities (sewer, water, gas, and electric service); and construct recreational facilities or amenities, all as shown in the Property Report (referenced on the cover page of this Agreement). Seller is likewise contractually bound to Purchaser to construct or install all of the above in accordance with the completion schedule set forth in the Property Report.

[Signatures on Following Page]

19

4844-9934-1059.01

IN WITNESS WHEREOF, the parties hereto have executed this Purchase Agreement as of the day and year first above written.

**PURCHASER:**

By: _____

Name: Lawrence V. Berkovich

Date: 12 / 10 / 08

By: _____

Name: Ke Ding Berkovich

Date: 12 / 10 / 2008

**SELLER:**

**THE VUE NORTH CAROLINA, LLC,** a Delaware limited liability company

By: The VUE-Charlotte, LLC, a Delaware limited liability company, its sole member

By: MCL Charlotte, LLC, a Delaware limited liability company, its sole member

By: MCL/XE, LLC, a Delaware limited liability company, its sole member

By: MCL Consolidated Ventures, LLC, a Delaware limited liability company, its Manager

By: MCL Companies of Chicago, Inc., an Illinois corporation , its Manager

By: _____
Name: Daniel E. McLean
Title: President

Date: December 10, 2008

20

4844-9934-1059.01

# PARKING ADDENDUM TO CONTRACT FOR SALE AND PURCHASE

This Addendum to Purchase Agreement is attached to and hereby made a part of that certain The VUE Charlotte, a Condominium Purchase Agreement entered into of even date herewith by and between The VUE North Carolina, LLC ("Seller"), and **Lawrence V. & ke Ding Berkovich,** ("Purchaser") with respect to Unit **5102** of The VUE Charlotte, a Condominium, Mecklenburg County, North Carolina (the "Contract").

Pursuant to §3.3(d) of the Declaration (as defined in the Contract). Seller hereby assigns the following parking space(s) to Purchaser: **3,4,& 5.** In consideration for such assignment, Purchaser shall pay at Closing, in addition to the Purchase Price referenced in the Contract, by bank cashier's check or by wire transfer of federal funds, the following amount: **0.00.** At Closing, Seller shall file with the Association (as defined in the Declaration) an assignment memorializing the assignment of the aforementioned parking space(s) by Seller to Purchaser, which assignment shall be part of the official records of the Association but shall not be recorded among the public records of Mecklenburg County, North Carolina.

Purchaser acknowledges that the location, alignment and striping of the parking space(s) allocated to the Unit may vary from the depiction of the same in the Condominium Documents, which are approximate and may not precisely conform to as-built conditions at Closing. Purchaser also acknowledges that the nature of stacked or structured parking is such that water may drip onto any vehicle from the parking deck level above the level on which the vehicle is parked or located, and that such dripping water may include calcium deposits which may cause damage to the vehicle. Neither Seller nor the Association shall be held liable for any loss or damage resulting from such calcium deposits to any vehicle. Note that damage to a vehicle may be limited if the owner of the vehicle immediately washes off any calcium deposits situated in the vehicle.

**PURCHASER:**

By: _____

Name: Lawrence V. Berkovich

Date: _____ 1 2 / 1 0 / 0 8 _____

By: _____

Name: Ke Ding Berkovich

Date: _____ 12 / 10 / 08 _____

**SELLER:**

**THE VUE NORTH CAROLINA, LLC,** a Delaware limited liability company

By:    The VUE-Charlotte, LLC, a Delaware limited liability company, its sole member

By:    MCL Charlotte, LLC, a Delaware limited liability company, its sole member

By:    MCL/XE, LLC, a Delaware limited liability company, its sole member

By:    MCL Consolidated Ventures, LLC, a Delaware limited liability company, its Manager

By:    MCL Companies of Chicago, Inc., an Illinois corporation , its Manager

       By: _____

       Name:  Daniel E. McLean

       Title:   President

Date: _____ December 16, 2008 _____

21

4844-9934-1059.01

## EARNEST MONEY ADDENDUM
## TO PURCHASE AND SALE AGREEMENT

This Addendum to Purchase Agreement is attached to and hereby made a part of that certain The VUE Charlotte, a Condominium Purchase Agreement entered into of even date herewith by and between The VUE Charlotte, LLC, a Delaware limited Liability company ("Seller") and **Lawrence & Ke Ding Berkovich** ("Purchaser"), with respect to Unit **5102** of The VUE Charlotte, a Condominium (the "Units"), Mecklenburg County, North Carolina (the "Contract").

Notwithstanding any and all terms and provisions in the Purchase Agreement, and without limiting the same, Purchaser and Seller further hereby agree that the earnest money deposit due shall be paid as follows:

$96,990.00 – Previously paid by Purchaser for Unit 39C01

$48,495.00 – to be paid on or before December 31, 2008

IN WITNESS WHEREOF, the parties hereto have executed this Unit Substitution Addendum this the ___16___ day of ___December___, 2008.

**SELLER**

**THE VUE NORTH CAROLINA, LLC,**
a Delaware limited liability company

By: The VUE-Charlotte, LLC, a Delaware limited
liability company, its sole member

  By: MCL Charlotte, LLC, a Delaware limited
  liability company, its sole member

    By: MCL/XE, LLC, a Delaware limited liability
    company, its sole member

      By: MCL Consolidated Ventures, LLC, a
      Delaware limited liability company, its
      Manager

        By: MCL Companies of Chicago, Inc.,
        an Illinois corporation, its Manager

        By: _____
        Name: _____
        Its: _____
        Date: ___December 16, 2008___

**PURCHASER**

By: _____

Print Name: Lawrence V. Berkovich

Date: ___12 / 10 / 08___

By: _____

Print Name: Ke Ding Berkovich

Date: ___12 / 10 / 2008___

4836-1376-8194.01



3 Bedrooms/3 Baths

2,265 Square Feet

Floor 51

Residence #: _____

Starting Price: _____

BEDROOM
11' x 15'

KITCHEN
15' x 21'

DINING ROOM
11' x 15'

BALCONY
15' x 20'

GREAT ROOM
27' x 14'

MASTER
BEDROOM
16' x 14'

BEDROOM
12' x 14'

BALCONY
6' x 14'

BALCONY
6' x 14'



N→



## THE
# VUE
### CHARLOTTE

704 374 0089

SALES CENTER



MGL Companies policy of continual improvements in design and construction requires and reserves the right to discontinue floor plans or change any specifications... Property... of the Property.

# DELAYED CLOSING ADDENDUM
## TO PURCHASE AND SALE AGREEMENT

This Delayed Closing Addendum to Purchase Agreement (this "Addendum") is attached to and is hereby made a part of that certain The VUE Charlotte, a Condominium Purchase Agreement (the "Purchase Agreement") entered into on December, ___, 2008 by and between The VUE North Carolina, LLC, a Delaware limited liability company ("Seller"), and Lawrence V. and Ke Ding Berkovich ("Purchaser"), with respect to Unit 5102 of the The VUE Charlotte, a Condominium, Mecklenburg County, North Carolina.

Notwithstanding any and all terms and provisions in the Purchase Agreement, and without limiting the same, Purchaser and Seller further agree as follows:

Delayed Closing Interest Timing.  Notwithstanding anything to the contrary set forth in the Purchase Agreement, Purchaser and Seller acknowledge and agree that the last paragraph of Section 9 is hereby amended by deleting it in its entirety and replacing it with the following:

> If Seller agrees in writing to reschedule closing at Purchaser's request, or if Purchaser is a corporation or other entity and Purchaser fails to produce the necessary corporate or entity papers Seller requests and as a result, closing is delayed, or if closing is delayed for any other reason (except for a delay desired, requested or caused by Seller), Purchaser agrees to pay at closing a late funding charge equal to interest, at the rate of 16% per annum, on that portion of the purchase price not then paid to Seller (and cleared), from the date thirty (30) days after the original closing date scheduled by Seller through the date of actual closing, pursuant to the terms and subject to the conditions of the Purchase Agreement.  All prorations will be made as of the originally scheduled date.  Purchaser understands that Seller is not required to reschedule or to permit a delay in closing.

In the event of any inconsistency or conflict between the terms of this Addendum and the Purchase Agreement, including but not limited to any inconsistent terms regarding the 16% fee provisions in Section 3 of the Purchase Agreement, the terms of this Addendum shall control.

[Signatures on Following Page]

4821-9508-6083.03

IN WITNESS WHEREOF, the parties hereto have executed this Addendum this the _16_ day of _DECEMBER_, 200_8_.

SELLER

**THE VUE NORTH CAROLINA, LLC,**
a Delaware limited liability company

By: The VUE-Charlotte, LLC, a Delaware limited
liability company, its sole member

  By: MCL Charlotte, LLC, a Delaware limited
  liability company, its sole member

    By: MCL/XE, LLC, a Delaware limited liability
    company, its sole member

      By: MCL Consolidated Ventures, LLC, a
      Delaware limited liability company, its
      Manager

        By: MCL Companies of Chicago, Inc., an
        Illinois corporation, its Manager

        By: _____
        Name: _____
        Its: _____
        Date: _December 10, 2008_

PURCHASER

By: _____

Print Name: Lawrence V. Berkovich

Date: _12 / 10 / 08_

By: _____

Print Name: Ke Ding Berkovich

Date: _12 / 10 / 2008_

4821-9508-6083.03

### TITLE ADDENDUM TO
### CONTRACT FOR SALE AND PURCHASE

This Title Addendum to Purchase Agreement is attached to and hereby made a part of that certain The VUE Charlotte, a Condominium Purchase Agreement entered into of even date herewith by and between The VUE-Charlotte, LLC, a Delaware limited liability company ("Seller"), and Lawrence V. & Ke Ding Berkovich, ("Purchaser") with respect to Unit 5102 (51PH2) of The VUE Charlotte, a Condominium, Mecklenburg County, North Carolina (the "Contract").

This Addendum is expressly incorporated into the Contract to which it is attached. This Addendum is designed to amend in part and to add in part to the terms of the Contract, but only to the extent expressly provided herein. Capitalized terms used herein and not otherwise defined herein shall have the meaning(s) attributed to them in the Contract. To the extent that the terms and conditions contained herein are inconsistent with the terms of the Contract to which this Addendum is attached (meaning that the terms of the Contract and this Addendum are mutually exclusive), the terms of this Addendum shall control. TO THE EXTENT THAT THE TERMS OF THIS ADDENDUM DO NOT EXPRESSLY CONTRADICT THOSE IN THE CONTRACT, THE CONTRACT SHALL REMAIN AS WRITTEN AND IN FULL FORCE AND EFFECT AS SUPPLEMENTED HEREBY.

Notwithstanding any terms and provisions in the Agreement, Purchaser and Seller agree as follows:

1.    Title.  Seller shall deliver and convey to Purchaser at closing, fee simple, marketable and insurable title to the Unit, subject only to those exceptions and matters identified in section 10 of the Contract, which exceptions and matters shall specifically not include any liens or encumbrances associated with or securing Seller's financing of the construction and development of the Condominium. The subordination provisions in section 39 of the Contract are only intended to apply and shall only apply prior to release of the Unit from the aforementioned financing encumbrances at closing. Purchaser shall have no obligation to close on the purchase of the Unit until such time as the Unit shall be released from any and all encumbrances securing Seller's project financing, it being clear that Seller may secure the release of the Unit from said encumbrance(s) using funds collected from Purchaser at closing, and that the required release from said encumbrances may take place simultaneously with the closing, as part thereof.

2.    The revised Contract terms contained in this Addendum may not generally be incorporated into the terms of other contracts with other contract purchasers of Units at the VUE Charlotte—the terms herein being generally more favorable to Purchaser. Purchaser acknowledges that Seller's ability to obtain the contract terms it continues to obtain may be adversely affected in the event that the terms of this Addendum are disclosed. That being the case, and with the acknowledgment that Seller has agreed to the terms of this Addendum in material reliance upon the substance of this Paragraph 2, Purchaser agrees that it shall not disclose or otherwise make public the terms of this Addendum to any person, other than Purchaser's attorneys, financing agents and/or other agents retained by Purchaser in connection with the closing or any legal dispute arising under the Contract, and in no event will Purchaser seek to record this Contract or a memorandum hereof in the public records.

[Signatures on attached Following Page]

This Title Addendum is executed and acknowledged as follows:

Executed by Seller on:

Date: December 16, 2008

The VUE-Charlotte, LLC

By: _____

Name: _____

       Seller's Authorized Representative

Executed by Purchaser on:

Date: 12 / 10 / 08

By: _____

Name: Lawrence V. Berkovich

By: _____

Name: Ke Ding Berkovich

By: _____

Name: _____

# UNIT SUBSTITUTION ADDENDUM
## TO PURCHASE AND SALE AGREEMENT

This Unit Substitution Addendum to Purchase Agreement (this "Unit Substitution Addendum" or "Addendum") is attached to and is hereby made a part of that certain The VUE Charlotte, a Condominium Purchase Agreement (the "Initial Purchase Agreement") entered into on **September 30, 2005**, by and between The VUE North Carolina, LLC, a Delaware limited liability company ("Seller"), **and Lawrence V. and Ke Ding Berkovich**, ("Purchaser") with respect to **Unit 39C01** of the The VUE Charlotte, a Condominium, Mecklenburg County, North Carolina.

Notwithstanding any and all terms and provisions in the Purchase Agreement, and without limiting the same, Purchaser and Seller further agree as follows:

Unit Substitution. Purchaser and Seller have entered into or will enter into that certain VUE Charlotte, a Condominium Purchase Agreement, for the purchase and sale of **Unit 5102 (51PH2)** of the VUE Charlotte, a Condominium (the "Substitute Agreement"), the intent being that Purchaser will purchase Unit 5102 instead of Unit 39C01 in said Condominium. So long as Purchaser and Seller have executed the Substitute Agreement, and so long as Purchaser is not is default thereunder and has not terminated the same, in each case, on the day following the expiration of the 7 day rescission period described in Section 24(a) of the Substitute Agreement (such day being referred to herein as the "Initial Purchase Agreement Termination Date"), then, without the need for further action of the parties, the Initial Purchase Agreement shall automatically terminate on the Initial Purchase Agreement Termination Date, upon which termination Purchaser and Seller shall have no further obligation or liability with respect to the Initial Purchase Agreement, except that all Deposits made by the Purchaser under the Initial Purchase Agreement shall roll over and be deemed to be Deposits made by the Purchaser pursuant to, and as of the effective date of the Substitute Agreement.

[Signatures on Following Page]

4849-8712-2435.02

IN WITNESS WHEREOF, the parties hereto have executed this Unit Substitution Addendum effective as of the date last signed by the parties below.

**SELLER**

**PURCHASER**

**THE VUE NORTH CAROLINA, LLC,**
a Delaware limited liability company

By: The VUE-Charlotte, LLC, a Delaware limited liability company, its sole member and as Seller under Initial Purchase Agreement

By: _____

Print Name: Lawrence V. Berkovich

By: MCL Charlotte, LLC, a Delaware limited liability company, its sole member

Date: _12_ / _10_ / _08_

By: MCL/XE, LLC, a Delaware limited liability company, its sole member

By: _____

Print Name: Ke Ding Berkovich

By: MCL Consolidated Ventures, LLC, a Delaware limited liability company, its Manager

Date: _12_/_10_/_2008_

By: MCL Companies of Chicago, Inc.. an Illinois corporation , its Manager

By: _____
Name: _____
Its: _____
Date: _December 16, 2008_

## PENTHOUSE/CHANGE ORDER ADDENDUM TO
## CONTRACT FOR SALE AND PURCHASE

This Penthouse/Change Order Addendum to Purchase Agreement is attached to and hereby made a part of that certain The VUE Charlotte, a Condominium Purchase Agreement entered into of even date herewith by and between The VUE-Charlotte, LLC, a Delaware limited liability company ("Seller"), and Lawrence V. & Ke Ding Berkovich, ("Purchaser") with respect to Unit 5102 (51PH2) of The VUE Charlotte, a Condominium, Mecklenburg County, North Carolina (the "Contract").

This Addendum is expressly incorporated into the Contract to which it is attached. This Addendum is designed to amend in part and to add in part to the terms of the Contract, but only to the extent expressly provided herein. Capitalized terms used herein and not otherwise defined herein shall have the meaning(s) attributed to them in the Contract. To the extent that the terms and conditions contained herein are inconsistent with the terms of the Contract to which this Addendum is attached (meaning that the terms of the Contract and this Addendum are mutually exclusive), the terms of this Addendum shall control. TO THE EXTENT THAT THE TERMS OF THIS ADDENDUM DO NOT EXPRESSLY CONTRADICT THOSE IN THE CONTRACT, THE CONTRACT SHALL REMAIN AS WRITTEN AND IN FULL FORCE AND EFFECT AS SUPPLEMENTED HEREBY.

Notwithstanding any terms and provisions in the Agreement, Purchaser and Seller agree as follows:

1. _Incorporation of Change Order_. The Change Order attached hereto, and the terms and conditions set forth therein, are by this reference expressly incorporated into the Contract to which this Addendum is attached.

2. _Penthouse Unit_. If any additional floor is added to the Condominium above the 51st floor (the 51st floor being the floor on which Unit 5102 is to be located), this will constitute a material change to the Contract, and Purchaser shall have the right to a new 7-day rescission period, with said 7-day period commencing on the date that Purchaser is notified in writing that there will be an additional floor above the 51st floor.

3. _Confidentiality_. The revised Contract terms contained in this Addendum may not generally be incorporated into the terms of other contracts with other contract purchasers of Units at the VUE Charlotte—the terms herein being generally more favorable to Purchaser. Purchaser acknowledges that Seller's ability to obtain the contract terms it continues to obtain may be adversely affected in the event that the terms of this Addendum are disclosed. That being the case, and with the acknowledgment that Seller has agreed to the terms of this Addendum in material reliance upon the substance of this Paragraph 2, Purchaser agrees that it shall not disclose or otherwise make public the terms of this Addendum to any person, other than Purchaser's attorneys, financing agents and/or other agents retained by Purchaser in connection with the closing or any legal dispute arising under the Contract, and in no event will Purchaser seek to record this Contract or a memorandum hereof in the public records.

[Signatures attached on following page]

4829-9626-9571.02

This Addendum is executed and acknowledged as follows:

Executed by Seller on:                          Executed by Purchaser on:

Date: _December 16, 2008_                        Date: _12/10/08_

The VUE-Charlotte, LLC                           By: _____
By: _____                    Name: Lawrence V. Berkovich
Name: _____
        Seller's Authorized Representative

                                                 By: _____

                                                 Name: Ke Ding Berkovich


                                                 By: _____

                                                 Name: _____

4829-9626-9571.02

# CHANGE ORDER

| Project: | VUE Charlotte | Change Order # | 1 |
|---|---|---|---|
| Building/Unit # | VUE Charlotte   Unit # 5102 | Date: | 10/16/2008 |
| Plant | 51 PH 2 | | |
| Buyer(s) | Lawrence & Ke Ding Berkovich | Rec'd by Options: | |
| Buyer ID# | | | |

| Option # | CR # | Description | Cost |
|---|---|---|---|
| | 1 | TO BE COMPLETED AS A PREMIUM FINISHED UNIT | N/C |
| | 2 | DELETE CARPET in master bedroom and master bedroom closet | N/C |
| | | ADD Standard Selection Hardwood Floors in master bedroom and master master bedroom closet *area 4* | N/C |
| | 3 | DELETE LINEN CLOSET off hallway | N/C |
| | | COMBINE Butlers Pantry and Linen Closet space to configure an office area as shown on the attached drawing which shall include a minimum of three (3) electrical receptacles, one (1) techport, and a 15 light french door | N/C |
| co999 | | Processing Fee | N/C |

Seller's obligation to complete the Premises, as set forth in Section 10 of the Contract, is hereby modified by the selections set forth above, subject to Seller's continuing reservation of the right to make certain changes or substitutions as set forth in Section 10 of the Contract. Any of the selections above that result in an increased Purchase Price shall be deemed to Extras as provided in Section 15 of the Contract and the Purchase Price is hereby adjusted as provided above. An amount equal to 20% of any increase to Purchase Price shall be payable directly to Seller at time of such selection in accordance with Section 15 of the Contract.

| | Total | $0.00 |
|---|---|---|

Buyer(s): _____   Date: 12/10/08
Date: 12/10/2008

SELLER:

THE VUE NORTH CAROLINA, LLC, a Delaware limited liability company
By: The VUE-Charlotte, LLC, a Delaware limited liability company, its sole member
By: MCL Charlotte, LLC, a Delaware limited liability company, its sole member
By: MCL/XE, LLC, a Delaware limited liability company, its sole member
By: MCL Consolidated Ventures, LLC, a Delaware limited liability company, its Manager
By: MCL Companies of Chicago, Inc., an Illinois corporation, its Manager

By: _____   Date: 12-16-08
Its: _____

Construction Approval/Date _____   Options & Upgrades Approval/Date _____

*The quality of such Hardwood Floors shall be consistent with living room floors*

*and hardwood floors of a quality identical to living room*



3 Bedrooms/3 Baths
2,265 Square Feet
Floor 51
Residence #: _____
Starting Price: _____

BEDROOM
11' x 13'

KITCHEN
15' x 21'

DINING ROOM
11' x 15'

BALCONY
15' x 20'

GREAT ROOM
27' x 14'

MASTER
BEDROOM
18' x 14'

BEDROOM
12' x 14'

BALCONY
6' x 14'

BALCONY
6' x 14'



N

VUE
CHARLOTTE